## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **YVONNE F.,** | **CIVIL ACTION NO.** |
| **Plaintiff,** | **1:18-CV-4389-SDG-CCB** |
| **v.** | |
| **COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,** | **FINAL REPORT AND RECOMMENDATION ON AN APPEAL FROM A SOCIAL** |
| **Defendant.** | **SECURITY DISABILITY ACTION** |

Plaintiff Yvonne F. brings this action under 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of the Social Security Administration (the Commissioner), who denied Plaintiff's claim for benefits for the period between May 30, 1997, and September 30, 1999. (Doc. 14-1 at 11–17). The action is now before the undersigned and is ripe for review under 42 U.S.C. § 405(g). For the reasons set forth below, based on the administrative record and the briefs of the parties, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **REVERSED AND REMANDED**.

## I.     PROCEDURAL HISTORY

Plaintiff filed an application for period of disability and disability insurance benefits in early 2009,[1] alleging an onset date of disability of May 20, 1997. (Doc. 14-2 at 28). Plaintiff's application was denied initially and on reconsideration, (Doc. 14-1 at 69–71), and Plaintiff requested a hearing by an Administrative Law Judge (ALJ), *id.* at 74. The hearing was held on February 1, 2011. *See id.* at 45. The ALJ denied Plaintiff's application on April 15, 2011. *Id.* at 45–46. Plaintiff appealed the ALJ's decision to the Appeals Council of the Social Security Administration (AC), which remanded the case to the ALJ. *Id.* at 103–06. A second hearing was held before the ALJ on November 21, 2013. (Doc. 14-10 at 12–42). A second decision followed in which the ALJ found that Plaintiff was not disabled during the relevant period—between May 20, 1997, and September 30, 1999. (Doc. 14-1 at 50–57).

Plaintiff appealed that decision to the AC, which again remanded the case to the ALJ. *Id.* at 115–26. A third hearing was held, this time before a different ALJ, on May 20, 2016. (Doc. 14-10 at 43–75). On August 17, 2016, the ALJ found that

---

[1] Plaintiff claims that this application was filed on March 16, 2009. (Doc. 18 at 2) (citing Doc. 14-2 at 28–29). However, there are other indications that it was filed on January 26, 2009. (Doc. 14-1 at 45, 116). The exact date is not material.

Plaintiff was not disabled during the relevant period. (Doc. 14-1 at 25–39). Plaintiff also appealed this decision, and the AC accepted review and issued its own ruling on July 19, 2018, again finding that Plaintiff was not disabled. *Id.* at 11–18. Plaintiff filed this action on September 18, 2018. (Doc. 1).

## II.     STANDARD FOR DETERMINING DISABILITY

An individual is "disabled" for purposes of disability benefits if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Any impairments must result from anatomical, psychological, or physiological abnormalities demonstrated by medically accepted clinical or laboratory diagnostic techniques, 42 U.S.C. § 423(d)(3), and those impairments must prevent the claimant from substantial gainful work, 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner must use a five-step sequential analysis:

(1)     Is the claimant currently working? If so, the claim is denied.

(2)     Is the claimed impairment severe; that is, does the impairment or

combination of impairments significantly limit the individual's

3

physical or mental ability to do basic work activities? If not, the claim

is denied.

(3)     Does the impairment equal or exceed in severity certain impairments

described in the impairment listings in the regulations? If so, the

claimant is automatically entitled to disability benefits.

(4)     Does the claimant have sufficient residual functional capacity (RFC)

to perform past work? If so, the claim is denied.

(5)     Considering the claimant's age, education, work experience, and

RFC, can the claimant perform any other gainful and substantial

work? If so, the claim is denied.

*See* 20 C.F.R. § 416.920. The "overall burden of demonstrating the existence of a

disability as defined by the Social Security Act unquestionably rests with the

claimant," although the burdens temporarily shift at step five of the sequential

analysis. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018)

(internal quotation marks omitted). Specifically, at step five, "the burden of going

forward shifts to the SSA to show the existence of other jobs in the national

economy which, given the claimant's impairments, the claimant can perform." *Id.*

(internal quotation marks omitted). "If the SSA makes this showing, the burden

shifts back to the claimant to prove she is unable to perform the jobs suggested by

the SSA." *Id.* (internal quotation marks and alteration omitted). If the claimant satisfies that burden by showing that she is unable to perform the work suggested by the Commissioner because of her impairment, the ALJ will find that the claimant is disabled and entitled to benefits. *Id.*

Federal courts may only review the Commissioner's "final decision." 42 U.S.C. § 405(g); *Parker v. Bowen*, 788 F.2d 1512, 1516 (11th Cir. 1986) (*en banc*). "[I]f the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision." *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000); *Evans v. Comm'r, Soc. Sec. Admin.*, 551 F. App'x 521, 523 (11th Cir. 2014). Thus, when the Appeals Council grants review, this Court's review should be directed to the Appeals Council's decision, which is entitled to the same deference as the decision of the ALJ. *See Parker*, 788 F.2d at 1516–17, 1522; *see also Solomon v. Comm'r, Soc. Sec. Admin.*, 532 F. App'x 837, 839 (11th Cir. 2013).

Here, the AC denied disability benefits at step five, finding that, although Plaintiff is not capable of performing her past relevant work, she has the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. (Doc. 14-1 at 15–16). On appeal, Plaintiff raises three issues: (1) whether the AC failed to properly weigh the medical opinion evidence and properly determine Plaintiff's RFC, (2) whether the ALJ (here, and on the next

issue as well, the AC simply adopted the decision of the ALJ) failed to properly evaluate Plaintiff's testimony, and (3) whether the ALJ relied on a flawed hypothetical question to the Vocational Expert (VE) and failed to reconcile conflicts between the VE's testimony and the Dictionary of Occupational Titles. (Doc. 18 at 2, 20–40). The Court sets forth the facts and findings of the AC below, with particular emphasis on those most relevant to the issues Plaintiff raises on appeal.

### III.    FACTS AND THE FINDINGS OF THE AC

#### A.    Hearing Testimony

At the second hearing held on November 21, 2013, Plaintiff testified that she had surgery for breast cancer in May of 1997 and has not worked since then. (Doc. 14-10 at 18). She stated that she had post-operation pain that was treated at the Emory pain clinic. *Id*. at 21–22. She testified that her pain was typically an eight or nine on a scale of one to ten, but with medication, the pain would decrease to a five "[i]f it was a good day." *Id*. at 24–25. She testified that she would probably have two "good days" per week and would not experience much pain relief on bad days. *Id*. at 25. She stated that her pain would inhibit her ability to care for her daughter, cook meals, do housework, and remember to pay bills. *Id*. at 25, 35. This affected her relationships with her family and husband. *Id*. at 29–30. Plaintiff also

6

testified that she suffered from depression that worsened after her breast cancer surgery. *Id.* at 29.

At the third hearing on May 20, 2016, Plaintiff again testified about her condition after undergoing surgery for her breast cancer. She stated that she used to be "very vivacious" and "on the go," but after the surgery, she felt like her "world stopped" and she "could no longer do anything that [she] used to do." *Id.* at 61–62. She testified that the chronic pain she experienced caused significant disruptions in her social life and her ability to work. *Id.*

### B.    The AC's Findings

The AC made the following findings:

1. The claimant met the special earnings requirements of the Act on May 20, 1997, the date the claimant stated she became unable to work and met them through September 30, 1999.

The claimant did not engage in substantial gainful activity from May 20, 1997 through September 30, 1999, the date last insured.

2. The claimant had the following severe impairments: status post breast cancer; myofascial pain syndrome; major depression; an anxiety disorder; and history of alcohol abuse, but does not have an impairment or combination of impairments which is listed in, or which is medically equal to an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

3. The claimant's combination of impairments resulted in the residual functional capacity to perform light work activity with only occasional use of ladders, ropes, or scaffolds; frequent ramps, stairs, balance, stoop, crawl, crouch, or kneel; is limited to simple, routine, repetitive tasks; best if only occasional contact with co-workers; no

ongoing public interaction; and low stress defined as only occasional change in work setting or decisionmaking.

4. The claimant's alleged symptoms were not consistent with and supported by the evidence of record for the reasons identified in the body of the Administrative Law Judge's decision and this decision.

5. The claimant is unable to perform any past relevant work.

6. The claimant was 45 years old, which is defined as a younger individual, on the date last insured, and has a high school education. The claimant's past relevant work is semiskilled or skilled with no transferable skills.

7. If the claimant had the capacity to perform the full range of the light exertional level, 20 CFR 404.1569 and Rule 202.21, Table No. 2 of 20 CFR Part 404, Subpart P, Appendix 2, would direct a conclusion of not disabled. Although the claimant's exertional and nonexertional impairments do not allow her to perform the full range of the light exertional level, using the above-cited Rule as a framework for decisionmaking, there are a significant number of jobs in the national economy which she could have performed as a sub-assembler of electronic equipment (Dictionary of Occupational Titles (DOT) 729.684-054) with 250,000 jobs in the national economy, assembler of small parts, of molded frames (DOT 713.684-014) with 140,000 jobs in the national economy, and marker II (DOT 920.687-126) with 650,000 jobs in the national economy[.]

8. The claimant was not disabled as defined in the Social Security Act at any time through September 30, 1999, the date last insured.

(Doc. 14-1 at 16–17).

In determining Plaintiff's RFC, the AC made the following finding:

The Appeals Council adopts the light residual functional capacity assessed by the Administrative Law Judge as expressed in the first hypothetical question presented to the vocational expert at the claimant's hearing. At the claimant's hearing, the Administrative Law Judge proposed that a hypothetical individual with the claimant's

8

same age, education, and past relevant work "is limited to light work activity with only occasional use of ladders, ropes, or scaffolds; frequent ramps, stairs, balance, stoop, crawl, crouch, or kneel; is limited to simple, routine, repetitive tasks; best if only occasional contact with co-workers; no ongoing public interaction; and low stress defined as only occasional change in work setting or decisionmaking."

*Id.* at 13. The AC continued by discussing the relevant evidence related to this RFC:

The Appeals Council finds that this residual functional capacity is supported by the evidence of record, including Dr. Harpe's opinion testimony that the claimant can perform simple, routine, repetitive tasks. Dr. Harpe also testified that prior to the date last insured, the claimant had difficulty with activities of daily living, did not pursue social activities, and would become fatigued over time and would not be able to follow through to complete a task. The Council assigns partial weight to Dr. Harpe's opinion testimony because the medical evidence of record does not demonstrate that the claimant was unable to sustain and complete work-related tasks during the period at issue. The record also does not demonstrate that the claimant had greater difficulties with daily activities and social interaction than assessed in this decision.

In assessing the claimant's residual functional capacity, the Administrative Law Judge did not adequately evaluate the numerous treating source opinions of record in accordance with 20 CFR 404.1527. The Appeals Council considered these opinions and finds that the opinions do not warrant changing the claimant's residual functional capacity. The record contains several written opinions from Dr. Harpe dated July 2009 through November 2015, which indicate that the claimant was markedly limited in many mental functioning areas, particularly involving social interaction and concentration and persistence, due to depression and pain syndrome, and that the claimant has been unable to work since May 20, 1997. Considering the discussion of the medical evidence in the hearing decision and the Council's review of the evidence of record, the

Council assigns little weight to these opinions. The medical evidence demonstrates that the claimant was able to sustain sufficient concentration and persistence to perform household chores and some volunteer work during the period at issue, and that she experienced improvement in her mood and other mental health symptoms with medication treatment and a decrease in alcohol consumption.

The record also contains several treating source opinions that found the claimant disabled due to pain and physical limitations. Specifically, in October 2008, primary care physician Mary Anne Valdecanas, M.D. noted that she reviewed the claimant's chart dating back to 1997 and she believed that the claimant became disabled from her first surgery in May 1997. In December 2008, Patricia Baumann, M.D. indicated that she had been involved in direct patient care of the claimant at the Center for Pain Management since August 1997 and found that the claimant has had significant debilitating chronic pain since her surgery on May 20, 1997.

Additionally, in November 2014, Dr. Valdecanas found that the claimant has been limited to sitting one hour in an eight-hour workday, standing and/or walking less than one hour in an eight-hour workday, lifting and carrying up to 5 pounds occasionally, and must alternate positions every 30 minutes since May 20, 1997. Considering the discussion of the medical evidence in the hearing decision and the Council's review of the evidence of record, the Council assigns little weight to these opinions. The claimant's treatment notes indicate that her breast cancer remained in remission through her date last insured, and that her myofascial pain syndrome improved with medication, injections and aquatic and physical therapy. Treatment notes often indicate that the claimant was neurologically intact with no motor or sensory deficits and had less tenderness and taut bands (trigger points) with treatment.

*Id.* at 14 (internal record citations omitted).

10

The AC also adopted the conclusions of the ALJ regarding Plaintiff's subjective statements regarding her symptoms. (Doc. 14-1 at 15). This adopted portion of the ALJ's decision offers this discussion of Plaintiff's subjective statements and testimony:

> At the hearing on May 20, 2016, the claimant testified that when she came home after her first surgery, she was not able to function as she had previously functioned. She stated that she used to be active and vivacious, but she was no longer able to keep social appointments. She was not able to engage with her husband or daughter as she had before. This made her feel guilty and she developed increasing symptoms of depression and anxiety.
>
> ….
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

*Id.* at 35–37. These comments were part of the ALJ's broader discussion of the medical evidence of record that related to Plaintiff's RFC. *Id.* at 29–37. That broader discussion included a detailed description of Plaintiff's medical history from 1997 to 1999, and it noted times in which Plaintiff displayed improving symptoms, as well as times when Plaintiff suffered limitations due to the severity of her symptoms. *See id.*

11

The AC made the following finding regarding jobs that existed in the national economy:

> At the claimant's hearing, a vocational expert testified that given the claimant's vocational factors and residual functional capacity, an individual would have been able to perform the representative occupations of sub-assembler of electronic equipment (Dictionary of Occupational Titles (DOT) 729.684-054) with 250,000 jobs in the national economy; assembler of small parts, of molded frames (DOT 713.684-014) with 140,000 jobs in the national economy; and marker II (DOT 920.687-126) with 650,000 jobs in the national economy. The Council finds that the vocational expert's testimony is consistent with information in the DOT, and that the demands of the cited jobs appear consistent with the claimant's assessed residual functional capacity.

(Doc. 14-1 at 16) (internal record citation omitted).

## IV.   SCOPE OF JUDICIAL REVIEW

In reviewing the denial of Social Security disability benefits, this Court "must review the agency's decision and determine whether its conclusion, as a whole, was supported by substantial evidence in the record." *Washington*, 906 F.3d at 1358 (internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (internal quotation marks omitted). Put differently, the Court "must decide whether on this record it would have been possible for a reasonable jury to reach the agency's conclusion." *Washington*, 906 F.3d at 1358

(internal quotation marks and alteration omitted). "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990) (internal quotation marks omitted).

The Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Rather, the Court may only "determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Id.* (internal quotation marks omitted). Indeed, even if the evidence preponderates against the Commissioner's findings, this Court must affirm if the decision is supported by substantial evidence. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007). The Commissioner's findings of fact, therefore, if supported by substantial evidence, "shall be conclusive." *Washington*, 906 F.3d at 1358 (internal quotation marks omitted) (quoting 42 U.S.C. § 405(g)). The Court reviews whether the Commissioner's decision was based on a proper view of the law, on the other hand, *de novo. See id.* at 1358; *Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1372 (N.D. Ga. 2006) (noting that "[t]here is no presumption that the legal standard applied

by the Commissioner was valid, or that it was properly applied" and that "the application of a wrong legal standard is grounds for remand").

## V.   DISCUSSION

As stated above, Plaintiff raises three issues on appeal: (1) whether the AC failed to properly weigh the medical opinion evidence and determine Plaintiff's RFC, (2) whether the ALJ failed to properly evaluate Plaintiff's testimony, and (3) whether the ALJ relied on a flawed hypothetical question to the VE and failed to reconcile conflicts between the VE's testimony and the Dictionary of Occupational Titles. (Doc. 18 at 2, 20–40). The Court will address each issue in turn.

### A.   Whether the AC Properly Weighed the Medical Opinion Evidence and Properly Determined Plaintiff's RFC

Plaintiff argues that the AC's discussion of her RFC is deficient in several areas. First, Plaintiff argues that the AC failed to properly evaluate the testimony and opinion evidence of Dr. Carol Harpe when determining Plaintiff's mental RFC and that the AC did not cite to any evidence supporting its RFC finding. (Doc. 18 at 22–28). Second, Plaintiff argues that the AC failed to properly evaluate the medical opinions of Dr. Mary Anne Valdecanas when determining Plaintiff's physical RFC and that the AC erred by not citing to any specific evidence to support that RFC finding. *Id*. at 29–31.

### 1.  Mental RFC - Dr. Harpe

#### a.  Oral Hearing Testimony

Plaintiff first challenges the AC's evaluation of Dr. Harpe's testimony that she gave at the May 20, 2016, hearing. (Doc. 18 at 22–23; Doc. 14-10 at 51–60). Plaintiff asserts that the AC distorted this testimony in finding that it was consistent with the AC's RFC finding, which allowed for light work that is limited to simple, routine, repetitive tasks. (Doc. 18 at 22). Plaintiff argues that Dr. Harpe's testimony is actually inconsistent with the RFC finding when viewed in context. *Id.* at 22–23, 28. In response, the Commissioner identifies the following key phrase that the AC used to explain the weight given to Dr. Harpe's oral testimony: the "medical evidence of record does not demonstrate that the claimant was unable to sustain and complete work-related tasks during the period at issue." (Doc. 24 at 13) (quoting Doc. 14-1 at 14).[2] The Commissioner argues that this phrase shows that the AC properly assigned "partial weight" to Dr. Harpe's oral testimony. *Id.* Further, the Commissioner notes that the AC cited specific evidence that contradicts Dr. Harpe's testimony in an earlier part of the decision. *Id.* (citing Doc. 14-1 at 13). In reply, Plaintiff notes that the earlier part of the AC's decision that

---

[2]  The Commissioner erroneously cites "Tr. 15" as the page that this quote appears on. The quote in question appears two pages earlier on page 4 of the AC's decision.

gives a more specific explanation of the weight afforded to Dr. Harpe's opinion occurred during the discussion of meeting or equaling a medical listing at step three of the sequential analysis, as opposed to the RFC finding at step four. (Doc. 26 at 3).

To put all of this in some context, it is necessary to quote Dr. Harpe's testimony in some detail. When read in context, it is clear that the ALJ plucked one sentence (about Plaintiff's ability to perform simple, routine, repetitive tasks) from several pages of testimony that, overall, suggest that Plaintiff does not have the ability to do even those simple routine tasks on a sustained basis. The ALJ and Dr. Harpe had this exchange at the hearing:

> Q:   I know she has limitations, but there's a difference between someone who has difficulty getting out of a house on occasion and someone who can't get out at all.
>
> A:   Well—
>
> Q:   How limited was she?
>
> A:   She was very limited. She would experience chronic back pain, burning pain if she even did things like lifting her arms over her head trying to vacuum her home. She had difficulty with low energy and fatigue, and she couldn't go to the grocery store and buy adequate food for the home. I believe her husband had to do a lot of that for her because she would experience increased, you know, pain, fatigue, low energy which unfortunately ended up with her responding by staying in her bed for excessive amounts of time and not even trying to get out and do things because she had so much pain

16

and discomfort and then that, in turn, affected her mood and sense of ability to do anything. So she felt like a failure and felt bad about herself and had increased guilt, and this was on a regular basis. She would try to go like physical therapy or water aerobics and be able to go once and then not be able to persist and continue to do those activities because of the symptoms of the—especially the chronic pain which then led to more depression and anxiety. So it interfered with her. She didn't interact with her neighbors, she didn't go to social functions, she did not go to the PTA meetings. She was not able to do even normal cleaning activities in her home all because she mainly had a lot of severe pain. They had to do a muscle flap in her back when they did reconstructive surgery, and she had constant chronic pain probably starting in the summer right after she had that original surgery and this persisted for years, and she saw a lot of different doctors to try to respond to that, you know, to try to treat that and as well as coming in to see me to try to cope and we really tried to work on that. I certainly encouraged her to get out and try to do things, and she would attempt to do it but then had to retreat, and productivity levels just never really got back to normal.

Q:    Well, I know she was restricted, but could she get out when she had to?

A:    I think if she had to but then she would follow that up by having more pain and then spending the next—if she went out to the grocery store and bought two or three items, then she was for the next two or three days to the bed not being able to do anything.

Q:    Now, let's talk about—actually, we had been already talking about it, but it's a separate category in our system. We were talking about daily functioning, various social functioning, and of course—

A:    Yes, sir.

Q:    —and what you have been discussing already impact—one impacts the other, such as going to the PTA or going shopping.

17

Could she—

A:     Right.

Q:     But could she go grocery shopping when it was necessary?

A:     I think she could not, you know, she might be able to go and pick up one or two items at the grocery store, but she could not go through a whole, you know, grocery store and shop and fill her cart and lift all those objects out of the—and come home and unload her groceries. She was unable to do that.

Q:     Okay. And how was her concentration, persistence, and pace affected?

A:     She had decreased concentration inability. She would have difficulty reading a book or focusing on, you know, doing anything that required persistent concentration. She felt like her memory functioning was impaired, and she spent a lot of time just maybe staying in bed and watching TV. She was not even—

Q:     Well, could she do, say, simple, routine, repetitive things? One or two-step activity?

A:     Yes, sir, I would imagine that she could do that. I think it was like trying to do anything over time, she would become fatigued and overwhelmed by pain. So she could initiate doing something but then be able to—not be able to follow-through and continue to like complete the task.

Q:     And, of course, just to confirm, the status you're talking about now occurred on or before date last insured which in this case was September 30th, 1999, is that correct?

A:     That's correct. These symptoms started early in 1997 and persisted throughout that period through 1999.

18

> Q:      Now, I know we have reports from you in the file, Dr. Harpe. Is this the kind of limitations reflected in those reports?
>
> A:      Yes, sir. My notes from the period of '97 through '99 report that she was not getting out of the house, not functioning, cleaning her house, was not able to fulfil those, you know, roles as a wife and mother pretty persistently for those—that two-year period.

(Doc. 14-10 at 53–57). The AC found support for the RFC in "Dr. Harpe's opinion testimony that the claimant can perform simple, routine, repetitive tasks." (Doc. 14-1 at 14). But that statement, about Plaintiff's ability to perform simple, routine, repetitive tasks, was immediately followed with a limitation that Plaintiff would not be able to persist in doing so or would have trouble completing such tasks: "Yes, sir, I would imagine that she could do that. I think it was like trying to do anything over time, she would become fatigued and overwhelmed by pain. So she could initiate doing something but then be able to—not be able to follow-through and continue to like complete the task." (Doc. 14-10 at 56). And the limitation about Plaintiff's inability to complete such tasks is entirely consistent with the rest of Dr. Harpe's testimony, where she recounts Plaintiff's chronic pain, her inability to lift her arms over her head to do things like vacuuming, her trouble with grocery shopping, the fact that she started but could not complete things like physical therapy and water aerobics, that she did not go to social functions or PTA

19

meetings, her inability to do normal household cleaning, the fact that even shopping for one or two items would knock her out for days, her inability to concentrate, and the doctor's overall assessment that Plaintiff "was not getting out of the house, not functioning, [or] cleaning her house." *Id.* at 53–57.

An RFC "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a *regular and continuing* basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996) (emphasis in original). If the AC wanted to rely on the doctor's testimony that Plaintiff could do simple repetitive tasks, then it had to also address and reconcile the testimony that she would not be able to "follow-through and continue to like complete the task…[because] she would become fatigued and overwhelmed by pain." (Doc. 14-10 at 56); *see McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (holding that an administrative decision is not supported by "substantial evidence" where the ALJ acknowledges only the evidence favorable to the decision and disregards contrary evidence); *Tankersley v. Comm'r, Soc. Sec. Admin.*, No. 1:17-CV-140-AJB, 2018 WL 1466278, at *23 (N.D. Ga. Mar. 26, 2018) (reversing and remanding where the ALJ impermissibly cherry-picked the

evidence favorable to his opinion while ignoring that which was favorable to the claimant). The AC must address the doctor's additional limitations on remand because Plaintiff has to be able to sustain the work suggested by her RFC on a regular and continuing basis.

Nor is the AC's statement that it gave Dr. Harpe's oral testimony "partial weight" sufficient for the Court to find that the opinion is supported by substantial evidence. The AC wrote that it assigned partial weight because "the medical evidence of record does not demonstrate that the claimant was unable to sustain and complete work-related tasks during the period at issue. The record also does not demonstrate that the claimant had greater difficulties with daily activities and social interaction than assessed in this decision." (Doc. 14-1 at 14). The AC simply cited to the "record" in claiming that the medical evidence and activities of daily living were inconsistent with Dr. Harpe's testimony. (Doc. 14-1 at 4). "[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179. "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Id*. (internal quotation marks omitted). "Therefore, when the ALJ fails to state with at least some measure of clarity the grounds for his decision, we will

21

decline to affirm simply because some rationale might have supported the ALJ's conclusion." *Id.* (internal quotation marks omitted).

The AC's statement here fails the "with particularity" requirement because it fails to explain what in "the record" it was referring to. *Winschel*, 631 F.3d at 1179; *see also Kahle v. Comm'r of Soc. Sec.*, 845 F. Supp. 2d 1262, 1272 (M.D. Fla. 2012) (holding that an ALJ improperly explained the weight given to an examining physician when the ALJ stated that the opinion was "inconsistent with the evidence of record, including medical records and statements/testimony from the [C]laimant regarding activities of daily living" because the ALJ did not "articulate how the opinion is inconsistent [with] the medical record or with which particular statement regarding Claimant's activities of daily living" (second alteration added)). This error requires reversal and remand. *See Kahle*, 845 F. Supp. 2d at 1272.

Nor is the Court convinced by the Commissioner's argument that the AC's earlier discussion of Dr. Harpe's oral testimony properly explains the AC's evaluation. (Doc. 24 at 13). The AC, in discussing whether Plaintiff meets or equals a listing at step three, noted that Dr. Harpe testified that the claimant would become fatigued and overwhelmed by pain when trying to do things over time and would not be able to follow through to complete a task. (Doc. 14-1 at 13). However, the AC found, "the record shows that the claimant was able to care for

22

her minor child, perform volunteer work, and complete household chores. Progress notes also indicate that the claimant presented with significantly improved affect and was neurologically stable with treatment." *Id.* (internal record citations omitted).

Plaintiff correctly notes that the AC offered this analysis at step three. The analysis at step three (whether Plaintiff medically equals a listing) is different than at step four (Plaintiff's RFC), and the AC did not incorporate its previous discussion of Dr. Harpe's testimony at step three into its discussion of the same testimony under the RFC determination. These are different discussions with different evidentiary requirements and conclusions. Moreover, the AC's citation to the record for the proposition that Plaintiff was able to care for her child, perform volunteer work, and complete household chores is, at best, dubious. It cites, for example, to an exam note from August 27, 1999, in which the doctor noted that Plaintiff was "trying to be involved in service activities, such as Meals on Wheels." (Doc. 14-3 at 161). The note does not say that Plaintiff was successful in doing so, and that distinction is important in light of Dr. Harpe's testimony that Plaintiff tried to get out and do things, would make an attempt, and then would have "to retreat." (Doc. 14-10 at 54–55). The AC also cited to exam notes, (Doc. 14-4 at 100–105), that are riddled with entries that are inconsistent with (or at least

which do not support) the AC's findings that Plaintiff was volunteering and doing housework, including:

- Plaintiff "in chronic pain," (Doc. 14-4 at 101);

- Plaintiff "has pushed herself—trying to clean house, etc.," *id.*;

- Plaintiff "continues to push herself and feel guilty re. not cleaning the house and allowing laundry to pile up," *id.*;

- a notation that Plaintiff's husband became "angry re. her not cleaning," *id.* at 102;

- a note that Plaintiff would "work on activities" and "getting out of house," *id.* at 103;

- several notes that she had signed up at a gym but could not exercise on a regular basis, *id.* at 103–05;

- a note that she was "looking" for volunteer work and did "sign up" to help at school, but no notes that she had actually done so (the handwriting is difficult to read—so perhaps the more accurate assessment is that the undersigned could not find a notation that Plaintiff had successfully volunteered anywhere), *id.* at 105.

24

The suggestion that Plaintiff was volunteering and completing housework is flatly inconsistent with Dr. Harpe's oral testimony, and it is a stretch to say that the portions of the record cited by the AC to rebut that testimony actually do.

And finally, the AC put a lot of weight on the fact that Plaintiff could do household chores. (Doc. 14-1 at 13, 14). As noted above, the citation to the record in support of that finding is shaky, and Dr. Harpe affirmatively testified that Plaintiff could *not* do household chores. Regardless, the Eleventh Circuit has cautioned that "participation in everyday activities of short duration, such as housework" does not disqualify a claimant from disability. *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997); *see also Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1252 (N.D. Ala. 2003) ("It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances.").

"The ALJ must give a treating physician's opinion substantial or considerable weight unless good cause is shown to the contrary." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1259 (11th Cir. 2019) (internal quotation marks omitted). All told, the AC plucked one statement about Plaintiff's ability to complete simple tasks from Dr. Harpe's lengthy discussion regarding Plaintiff's inability to do just about anything on a sustained basis. The AC ambiguously noted that "the record"

25

is inconsistent with the doctor's opinion, and when it did cite to specific evidence in the course of its step three analysis, those record documents fail to support the weight the AC heaped upon them. And the AC put a good bit of emphasis on Plaintiff's alleged ability to complete household tasks, without explaining how, even if true, that ability supported its finding that Plaintiff could carry on sustained work activities for eight hours per day over a five-day workweek. If Dr. Harpe were not a treating source, then the outcome might be different. But she is, and the AC's explanation simply does not amount to good cause for giving her opinion something less than controlling weight. The case needs to be remanded so the AC can better explain or reconsider its treatment of Dr. Harpe's testimony.[3]

### b. *Written Medical Opinions*

Plaintiff makes several arguments regarding the AC's treatment of Dr. Harpe's written medical opinions. (Doc. 18 at 24–28). The AC described these written opinions as indicating that Plaintiff "was markedly limited in many mental functioning areas, particularly involving social interaction and concentration and

---

[3] The AC also noted that Plaintiff showed some improvement. (Doc. 14-1 at 13). True enough. Indeed, Dr. Harpe recognized that her symptoms would have been even worse but for her medication. (Doc. 14-10 at 49). Whether medication may have helped, however, is not the dispositive issue, and the AC's decision fails to explain how that fact constitutes good cause for affording less than controlling weight to Dr. Harpe's testimony.

persistence, due to depression and pain syndrome, and that the claimant has been unable to work since May 20, 1997." (Doc. 14-1 at 14). The AC assigned these opinions little weight because of other medical evidence that indicated that Plaintiff "was able to sustain sufficient concentration and persistence to perform household chores and some volunteer work…, and that she experienced improvement in her mood and other mental health symptoms with medication treatment and a decrease in alcohol consumption." *Id.*

Plaintiff contends that the AC should have given Dr. Harpe's written opinions more weight. Plaintiff first argues that the decision to give "little weight" to Dr. Harpe's written opinions is not supported by substantial evidence because the AC relied on Plaintiff's activities of daily living, which were consistent with the written opinions. (Doc. 18 at 24–25). Second, Plaintiff argues that the AC improperly relied on Plaintiff's modest improvement with treatment. *Id.* at 25–26. Third, Plaintiff argues that the AC did not weigh the written opinions "using all of the factors provided in 20 C.F.R. 404.1527 and 416.927" as stated in SSR 96-2p. *Id.* at 27. Finally, Plaintiff states that the AC did not cite any evidence to support its RFC finding and that it therefore must have "relied on its own lay judgment of the medical data or…simply picked an RFC out of thin air." *Id.* at 28–29.

27

The Court has addressed each of these arguments above in the course of explaining why the AC's explanation of its treatment of Dr. Harpe's oral testimony was insufficient. The Court simply notes that Dr. Harpe's written opinions are entirely consistent with those that she expressed orally at the hearing. She opined that Plaintiff has marked limitations (meaning that the limitations effectively preclude Plaintiff from performing the activity in a meaningful manner) in her ability to carry out detailed instructions, in the ability to maintain attention and concentration for extended periods, in the ability to perform activities within a schedule and maintain regular attendance, in the ability to sustain ordinary routine without supervision, in the ability to work with others without being distracted by them, in the ability to complete a normal workweek without interruptions from psychologically based symptoms, and in the ability to interact with the public. (Doc. 14-3 at 69–72). Dr. Harpe wrote that Plaintiff is incapable of tolerating even low stress in the work environment and that she would be absent from work more than three times per month as a result of her impairments. *Id.* at 73–74. These written findings are consistent with the doctor's oral testimony, and the AC on remand should address the weight it affords the opinions consistent with the discussion above.

28

### c. Plaintiff's Remaining Arguments

Plaintiff also cites SSR 96-2p[4] to argue that the AC erred by not explaining how the factors in 20 C.F.R. §§ 404.1527 and 416.927 warranted giving Dr. Harpe's opinion little weight. (Doc. 18 at 27). And Plaintiff cites to SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996), to argue that the AC erred by failing to "cite to *any* specific medical facts or even persuasive non-medical evidence that supports" the mental RFC. (Doc. 18 at 28). In response, the Commissioner maintains that these arguments are an attempt to have the Court reweigh the evidence. (Doc. 24 at 17–18, 27–28).

SSR 96-2p states that even when a treating source opinion is not well-supported by the evidence or is otherwise inconsistent with the evidence and therefore not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." 1996 WL 374188, at *4.[5] Those factors are: (1) the

---

[4] SSR 96-2p has been rescinded, but it applies here because the claim was filed prior to March 27, 2017. *Errica L. v. Comm'r, Soc. Sec. Admin.*, No. 1:17-CV-1774-AJB, 2018 WL 4377568, at *14 n.22 (N.D. Ga. Sept. 13, 2018).

[5] Social Security Rulings are not binding on courts but are accorded deference so long as they are reasonable interpretations that are consistent with the Social Security Act and regulations. *See Fair v. Shalala*, 37 F.3d 1466, 1468–69 (11th Cir. 1994); *see also Thornton v. Comm'r, Soc. Sec. Admin.*, 597 F. App'x 604, 610 (11th Cir.

examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record. 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6); *see also Suzon Tiffiney W. v. Comm'r, Soc. Sec. Admin.*, No. 1:17-cv-4038-AJB, 2019 WL 1417229, at *14 (N.D. Ga. Mar. 29, 2019). Under SSR 96-2p, the AC is not required to explicitly address each factor in its decision so long as it supports its decision with substantial evidence. *See Frizzell v. Comm'r of Soc. Sec.*, No. 6:16-cv-1476-Orl-DCI, 2017 WL 4242027, at *6 (M.D. Fla. Sept. 25, 2017).

SSR 96-8p requires an RFC assessment to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." 1996 WL 374184, at *7.

Here, the AC did not err by failing to address each factor individually under SSR 96-2p. Further, the Court agrees with the Commissioner that Plaintiff's citation to evidence that fulfills the factors simply invites the Court to reweigh the

---

2015); *Errica L.*, 2018 WL 4377568, at *16 n.24.

evidence in her favor. And Plaintiff overstates her case under SSR 96-8p when she claims that the AC "did not cite to *any*" medical or non-medical evidence to support the mental RFC. (*See* Doc. 18 at 28). Indeed, the AC relied on Dr. Harpe's oral testimony and written opinions to support the RFC, albeit with limited weight. (Doc. 14-1 at 14). Obviously, Plaintiff disagrees with the AC's interpretation, but it cannot be said that the AC relied on no evidence at all in determining Plaintiff's mental RFC or that there is no citation to any medical or non-medical evidence during the narrative discussion. To be clear, the Court has already held that the AC's discussion of Dr. Harpe's medical opinions is impermissibly non-specific and thus, in its current state, does not fulfill the requirement to provide good cause for affording less than controlling weight. But the Court does not find that Dr. Harpe's opinions necessarily compel a finding of disability—on remand, the AC simply needs to explain the weight it affords those opinions and, if it continues to assign them less than controlling weight, provide good cause for doing so.

### 2. *Physical RFC - Dr. Valdecanas*

Plaintiff next argues that the AC improperly weighed the medical opinion of Dr. Mary Anne Valdecanas regarding Plaintiff's physical functioning. (Doc. 18 at 29–31). Plaintiff also argues that the AC did not cite any affirmative evidence

supporting the RFC, as required by SSR 96-8p. (Doc. 18 at 31). In response, the Commissioner argues that the AC was not required to give Dr. Valdecanas's opinion any weight because she did not treat Plaintiff during the relevant period and did not rely on any medical evidence from the relevant period in her findings. (Doc. 24 at 19–20). The Commissioner further argues that the AC properly weighed and discounted Dr. Valdecanas's non-treating opinion by citing to conflicting evidence of Plaintiff's positive response to treatment for her myofascial pain syndrome. *Id.* at 21–22. In reply, Plaintiff reiterates that the AC did not discuss any evidence that supports the physical RFC finding. (Doc. 26 at 5).

Before turning to the arguments concerning the AC's consideration of Dr. Valdecanas's opinions, the Court first decides whether she was a treating source. Plaintiff refers to her as a treating source but offers no response to the Commissioner's argument that she is not. (Doc. 18 at 30; Doc. 24 at 19). The Court agrees with the Commissioner that Dr. Valdecanas did not treat Plaintiff during the relevant time period and thus is not a treating source for present purposes. (Doc. 24 at 19). Dr. Valdecanas did not begin treating Plaintiff until June 15, 2005. (Doc. 14-8 at 11). As such, her opinion about Plaintiff's condition during the relevant time period, between May 20, 1997 and September 30, 1999, is not the opinion of a treating source. *See Rogers v. Astrue*, 895 F. Supp. 2d 541, 549 (S.D.N.Y.

32

2012) ("The treating physician rule, however, does not technically apply when the physician was not the treating physician at all during the relevant time period."); *Homrighouse v. Astrue*, No. 5:08-cv-374-Oc-GRJ, 2009 WL 3053705, at *9 (M.D. Fla. Sept. 18, 2009) (holding that the opinion of a treating doctor who did not start treating the plaintiff until after the date of last insured "was speculative and, although relevant, certainly less probative than medical evidence generated closer in time to Plaintiff's date last insured" (footnotes omitted)). "Nonetheless, the fact that a treating physician did not have that status at the time referenced in a retrospective opinion does not mean that the opinion should not be given some, or even significant weight." *Rogers*, 895 F. Supp. 2d at 549 (internal quotation marks omitted).

That settled, the Court turns to Plaintiff's arguments, which attempt to show that the AC improperly considered Dr. Valdecanas's opinion. Dr. Valdecanas opined that Plaintiff has metastatic breast cancer, type II diabetes, cervical and lumbar spine osteoarthritis, hypertension, hypothyroid, and depression. (Doc. 14-8 at 11). She stated that Plaintiff suffers from chest wall pain from her breast cancer, that she is limited to sitting only one hour in an eight-hour workday, that she can stand or walk for less than one hour in an eight-hour day, that she would have to move from a seated position every 30 minutes, and that she can only occasionally

lift or carry up to five pounds and never lift or carry more than five pounds. *Id.* at 12–13. Dr. Valdecanas opined that Plaintiff's limitations apply back to May 20, 1997. *Id.* at 15. In 2008, Dr. Valdecanas stated that Plaintiff became disabled as of the time of her first surgery in May of 1997. (Doc. 14-6 at 93).

The AC assigned little weight to Dr. Valdecanas's opinions, noting that treatment notes indicate that Plaintiff's breast cancer remained in remission through her date of last insured and that her myofascial pain syndrome improved with medication, injections, and therapy. (Doc. 14-1 at 14). The AC observed that treatment notes further indicate that Plaintiff "was neurologically intact with no motor or sensory deficits and had less tenderness and taut bands (trigger points) with treatment." *Id.* The AC recognized that Plaintiff developed recurrent localized cancer of the left chest wall in December of 2003, "but the resulting symptoms and limitations do not relate back to the period on or before the claimant's date last insured." *Id.* at 15.

Plaintiff presents three arguments: (1) the AC misunderstood that Dr. Valdecanas's opinions were not based just on the breast cancer, but rather on Plaintiff's myofascial pain syndrome and resulting chronic pain from her mastectomy, (2) the AC placed too much weight on Plaintiff's modest positive response to treatment of her myofascial pain, and (3) the AC did not consider all

of the factors required by 20 C.F.R. § 404.1527(c). (Doc. 18 at 29–31). None of these arguments are persuasive.

As to the first argument, Dr. Valdecanas does mention breast cancer in her discussions of Plaintiff's limitations. (*See* Doc. 14-2 at 110; Doc. 14-8 at 11). The fact that the AC mentioned that Plaintiff's breast cancer remained in remission for the relevant period does not show a fundamental misunderstanding. On the contrary, it shows that the AC noticed that the recurrence of Plaintiff's breast cancer was a significant aspect of Dr. Valdecanas's treatment relationship and discounted it because it was not chronologically relevant.

For the second argument, the AC cited to record evidence that showed a positive response to treatment for Plaintiff's myofascial pain. (*See* Doc. 14-1 at 14). This record evidence shows that Plaintiff was "well controlled" with pain medication, (Doc. 14-4 at 13), that the pain in her intrascapular region was "significant[ly] improving," (Doc. 14-3 at 165), and that her interscapular pain was improving, *id.* at 163. The Court agrees with the Commissioner that Plaintiff is simply and impermissibly inviting the Court to reweigh the evidence in her favor when Plaintiff asserts that her record of improving with treatment is not sufficient to contradict Dr. Valdecanas's opinions. Substantial evidence underlies the AC's

finding that Plaintiff's positive response to treatment is inconsistent with Dr. Valdecanas's opinion regarding the disabling effects of Plaintiff's myofascial pain.

And for the third argument, Plaintiff offers nothing more than the identification of evidence that could meet all the factors outlined in 20 C.F.R. § 404.1527(c). (Doc. 18 at 30–31). This is the same argument that Plaintiff made regarding the application of these factors to Dr. Harpe's opinion and it fails for the same reason: the AC was not required to specifically refer to all of the factors, and the factors that the AC did specifically discuss are supported by substantial evidence.

Beyond these three arguments related specifically to Dr. Valdecanas's opinions, Plaintiff asserts a final argument contesting the AC's physical RFC finding. Plaintiff asserts that the AC did not cite to any evidence, as required by SSR 96-8p, to support the RFC finding that she can perform light work. (Doc. 18 at 31). This is the same argument that Plaintiff made as to the mental RFC. In response, the Commissioner argues that the AC met the requirements of SSR 96-8p by evaluating the medical evidence of record and adopting the ALJ's discussion of the medical evidence. (Doc. 24 at 28).

Unlike the mental RFC where the Court found that the AC did cite to medical evidence (even though there were errors with the consideration of that

evidence), the AC never states what evidence is consistent with the physical RFC finding. Rather, the AC only explains why it discounts various of the medical opinions. (Doc. 14-1 at 14–15). Plaintiff is correct that, for the physical RFC, the AC cites no medical or non-medical evidence supporting it.

This particular issue is complicated by the fact that the AC was not entirely clear in indicating what portions of the ALJ's opinion it adopted as its own (and here, of course, it is the AC's decision that is the final one that the Court reviews). The AC noted that the ALJ had offered alternative findings regarding the RFC (one finding a limited range of light work and an alternative RFC finding of sedentary work), and it adopted the ALJ's "light work" RFC finding. *Id.* at 13. But it did not adopt any rationale or basis for that RFC, nor did it explain what led it to adopt one or the other of the ALJ's alternate RFC findings. *Id.* The Commissioner suggests that the AC also adopted "the ALJ's discussion of the medical evidence and other evidence of record to support the light work RFC finding." (Doc. 24 at 28). The Commissioner cites to one page in the AC's decision and seven pages of the ALJ's decision. *Id.* (citing Doc. 14-1 at 15, 30–37). On the cited page of the AC's decision, the AC did indeed adopt some of the ALJ's findings in a single sentence by stating: "The Appeals Council also considered the claimant's statements concerning the alleged symptoms and adopts the Administrative Law Judge's

conclusions in that regard." (Doc. 14-1 at 15). The Commissioner's suggested reading of this adoption—that it adopts all of the ALJ's findings regarding the light-work RFC—is rather broad. There is nothing to suggest that the AC intended to adopt the ALJ's seven-page discussion of Plaintiff's medical history by stating that it was adopting the ALJ's conclusions regarding Plaintiff's "statements concerning the alleged symptoms." Indeed, the ALJ only mentioned statements that Plaintiff made when he recounted Plaintiff's hearing testimony, and even then he only seems to discuss the testimony as it was relevant to Plaintiff's mental RFC. (*See* Doc. 14-1 at 35). If the AC thought that these statements supported the physical RFC, it certainly did not make it obvious. All told, the AC's decision does not make it clear that it considered any evidence supporting the physical RFC, as required by SSR 96-8p. *See* SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts…and nonmedical evidence.…"). Particularly because this case should be reversed for other reasons, the AC on remand should make clear exactly what portions of the ALJ's opinion it adopts to support the physical RFC finding.

38

### B.     Whether the ALJ Properly Considered Plaintiff's Testimony

Plaintiff argues that the ALJ's discussion, as adopted by the AC, does not properly evaluate Plaintiff's testimony because the ALJ merely used boilerplate language to find that Plaintiff's testimony was not entirely consistent with the medical and other evidence in the record. (Doc. 18 at 32–33). In response, the Commissioner argues the ALJ used this boilerplate language only after extensively discussing the other record evidence. (Doc. 24 at 24–28). In reply, Plaintiff argues that the ALJ's extensive discussion of the medical evidence does not show that he properly discounted Plaintiff's testimony because there is no link between the two—the ALJ never explains why the medical evidence undercuts Plaintiff's testimony. (Doc. 26 at 5–6).

The Eleventh Circuit "has established a three part 'pain standard' that applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id*. "The standard also applies to

39

complaints of subjective conditions other than pain." *Id.* "After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992). "If the ALJ refused to credit subjective pain testimony where such testimony is critical, he must articulate specific reasons for questioning the claimant's credibility." *Id.* "Where proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the [Commissioner]'s decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (internal quotation marks and alteration omitted).

Here, the ALJ did not properly consider Plaintiff's subjective testimony because his discussion does not make an explicit credibility finding nor does it clearly imply one. The ALJ used the following language to discredit Plaintiff's testimony:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Doc. 14-1 at 37). And the AC adopted the ALJ's findings on this issue. *Id.* at 15.

The Court agrees with Plaintiff that this language does little to explain why the ALJ discredited Plaintiff's testimony. And the rationale is important because without knowing why the ALJ made this determination, the Court cannot decide whether substantial evidence supports it. *See Marbury*, 957 F.2d at 839.

The Court is unconvinced by the Commissioner's argument that the ALJ's seven-page discussion of the record evidence clearly implies that the ALJ made a specific credibility finding. (Doc. 24 at 24–27). The Commissioner cites numerous places among the seven pages where the ALJ noted some evidence that was inconsistent with Plaintiff's subjective testimony. For example, the ALJ noted evidence in the record of Plaintiff: "doing well post-operatively," (Doc. 14-1 at 32), reporting having "no symptoms of depression at this time," *id.* at 33, having an improved mood, *id.*, "looking better," *id.*, and having a stable mood and brighter affect, *id.* at 34. But among that evidence that was inconsistent with Plaintiff's testimony, the ALJ also noted evidence that was consistent. For example, the ALJ examined evidence that Plaintiff: "had chronic pain problems in her back and breast areas and her surgeon was angry with her because he felt she was overusing her narcotic pain medications," *id.* at 33, "experienced increased anxiety whenever

41

her husband was around," *id.*, "expressed her frustration with not being able to physically function as well as she had in the past due to chronic pain," *id.* at 34, "reported that she had back pain and fatigue at the end of the day," *id.*, and "still had chronic pain issues," *id.* There are many more examples of evidence that is consistent with Plaintiff's subjective complaints and evidence that is inconsistent with Plaintiff's subjective complaints in the ALJ's seven-page discussion of the record. *See id.* 30–36. The ALJ's discussion reads like a pure description of the record evidence, rather than an implied credibility finding wherein the ALJ would have cited evidence to support his finding while explaining why the contrary evidence carries less weight. *See Mueller v. Colvin*, 524 F. App'x 282, 285 (7th Cir. 2013) ("The ALJ here offered no specific reasons for finding [the claimant] not credible. Though he recited [the claimant]'s medical records and daily activities, he did not explain whether they were consistent or inconsistent with the pain and limitations she claimed, affording this court no rationale to review meaningfully."); *Bourget v. Comm'r of Soc. Sec.*, No. 8:13-cv-2841-T-30TBM, 2014 WL 7274806, at *5–6 (M.D. Fla. Dec. 22, 2014) (holding that an ALJ sufficiently explained why the ALJ discounted plaintiff's subjective testimony when the ALJ included in its discussion of the record evidence unremarkable findings and positive response to treatment that could be "fairly read to reflect the ALJ's

42

conclusion that" the plaintiff's testimony was not entirely credible). The Court cannot say that the ALJ's discussion makes clear the reasons that he rejected Plaintiff's testimony. The ALJ's comments are not unequivocal, and the ALJ notes places where the evidence is consistent with Plaintiff's testimony nearly as often as he notes where the evidence is inconsistent. This varied discussion does not clearly imply that the ALJ discredited Plaintiff's testimony. Thus, the Court cannot meaningfully review his credibility determination (or even determine to what extent the ALJ credited Plaintiff's subjective testimony), and the case must be remanded for the Commissioner to articulate specific reasons for questioning the claimant's credibility. It is fine, of course, to rely on the medical evidence to discredit a claimant's testimony. But the ALJ cannot simply recount the evidence—which both supports and calls into question Plaintiff's testimony—and then with no analysis say that Plaintiff's testimony is not consistent with the evidence.

### C.   Whether the ALJ Erred at Step Five

Plaintiff argues that the ALJ erred at step five by relying on a flawed hypothetical question to the VE and by failing to reconcile conflicts between the testimony of the VE and the Dictionary of Occupational Titles (DOT). (Doc. 18 at 35). Because the AC adopted the ALJ's RFC finding as expressed in this

hypothetical question, the Court reviews the ALJ's opinion as the final decision of the Commissioner.

### 1.  The Hypothetical Question Posed to the VE

Plaintiff argues that the hypothetical question posed to the VE did not include all of Plaintiff's mental restrictions. *Id*. Specifically, Plaintiff asserts that the "ALJ's failure to account for the moderate restrictions in concentration, persistence, or pace in the accepted hypothetical to the vocational expert is reversible error." *Id*. at 36. Plaintiff also argues that both the ALJ and the AC erred by not accounting for limitations in Plaintiff's "ability to interact with others," as required by 20 C.F.R. § 404.1520a. *Id.* at 37. In response, the Commissioner argues that the ALJ accounted for Plaintiff's "concentration, persistence, and pace" deficiencies by limiting Plaintiff to "simple, routine, repetitive tasks." (Doc. 24 at 31). Regarding the limitations in Plaintiff's ability to interact with others, the Commissioner contends that the ALJ accounted for this by including in the RFC a limitation to "best if only occasional contact with co-workers; no ongoing public interaction." *Id.* at 29. Plaintiff does not argue this point further in reply.

"[W]here a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a PRTF [psychiatric review technique form] and append it to the decision, or incorporate its mode of

analysis into his findings and conclusions." *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005). This technique requires the ALJ to evaluate the claimant's functional limitation in four areas: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(3); *see Moore*, 405 F.3d at 1213.[6] An ALJ can consider the findings made in the special technique in determining the claimant's RFC. *See Winschel*, 631 F.3d at 1180.

The AC specifically addressed three of the four areas at step three of the analysis, (Doc. 14-1 at 12–13), and Plaintiff argues that because it failed to address Plaintiff's ability to interact with others, any limitation in that area could not have been included in the hypothetical question posed to the VE, (Doc. 18 at 37). But, in fact, the ALJ's question to the VE specifically limited the hypothetical person to having "only occasional contact with coworkers, [and] no ongoing public interaction." (Doc. 14-10 at 71–72). Although Plaintiff does not suggest what additional limitation the ALJ should have included in the hypothetical to account for any limitations in her ability to interact with others, the hypothetical the ALJ

---

[6] The four areas have changed since the claim at issue in *Moore.* The Court uses the four areas in the version of the regulation that the AC used in this case. (Doc. 14-1 at 12).

used was sufficient to cover even moderate limitations in that area. *See Luterman v. Comm'r of Soc. Sec.*, 518 F. App'x 683, 690–91 (11th Cir. 2013) (holding that an ALJ's question to a VE sufficiently accounted for a claimant's "moderate limitations in social functioning" by including a limitation for "minimal social interaction and no public contact"). Any error in this regard was therefore harmless.

Plaintiff further argues that the hypothetical posed to the VE, which included a limitation to "simple, routine, repetitive tasks," was insufficient to account for her moderate difficulties in the ability to concentrate, persist, or maintain pace. (Doc. 14-1 at 13). The parties present dueling citations to cases supporting their respective positions regarding whether a limitation to simple, routine, repetitive tasks is sufficient to account for a moderate limitation in the ability to concentrate, persist, or maintain pace. Plaintiff cites *Winschel*, 631 F.3d at 1180; *Derrico v. Comm'r of Soc. Sec*, No. 1:09-CV-3138-AJB, 2011 WL 1157690, at *24 (N.D. Ga. Mar. 29, 2011); *Stinson v. Comm'r of Soc. Sec. Admin.*, No. 1:13-cv-22153-UU, 2015 WL 12533088, at *1 (S.D. Fla. Mar. 12, 2015); and *Beira v. Comm'r of Soc. Sec.*, No. 6:12-cv-147-Orl-18TBS, 2013 WL 937736, at *9–10 (M.D. Fla. Feb. 21, 2013), *adopted by* 2013 WL 937718 (M.D. Fla. Mar. 11, 2013). Defendant cites *Winschel*, 631

46

F.3d at 1180–81; *Lee v. Comm'r, Soc. Sec. Admin.*, 551 F. App'x 539, 541 (11th Cir.

2014); and *Rosario v. Comm'r of Soc. Sec.*, 490 F. App'x 192, 195 (11th Cir. 2012).

The proper interpretation of the caselaw on this issue requires an

understanding of what the Eleventh Circuit decided in *Winschel*. There, the

Eleventh Circuit offered this analysis of a hypothetical question posed to a VE:

> At step five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform. *Phillips*, 357 F.3d at 1239[7]; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). An ALJ may make this determination either by applying the Medical Vocational Guidelines or by obtaining the testimony of a vocational expert. *Phillips*, 357 F.3d at 1239–40. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam).
>
> We have never addressed in a published opinion whether a hypothetical question to a vocational expert must specifically account for limitations in concentration, persistence, and pace identified during the Psychiatric Review Technique ("PRT"). The Commissioner contends that to include such limitations in a hypothetical question would inappropriately conflate independent inquiries — the PRT, at steps two and three, and the RFC, at step four. Other circuits have rejected this argument, *see Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003) (per curiam); *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996), and so do we. Though the PRT and RFC evaluations are undeniably distinct, *see* 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3), nothing precludes the ALJ from considering the results of the former

---

[7] *Phillips v. Barnhart*, 357 F.3d 1232 (11th Cir. 2004).

in his determination of the latter. *See Ramirez*, 372 F.3d at 555 ("While [Social Security Ruling] 96–8p does state that the [PRT] findings are 'not an RFC assessment' and that step four requires a 'more detailed assessment,' it does not follow that the findings on the [PRT] play no role in steps four and five, and [Social Security Ruling] 96–8p contains no such prohibition.").

Other circuits have also rejected the argument that an ALJ generally accounts for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work. *See Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009) (per curiam); *Ramirez*, 372 F.3d at 554; *Newton*, 92 F.3d at 695. But when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations. *See Simila v. Astrue*, 573 F.3d 503, 521–22 (7th Cir. 2009); *Stubbs–Danielson v. Astrue*, 539 F.3d 1169, 1173–76 (9th Cir. 2008); *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001). Additionally, other circuits have held that hypothetical questions adequately account for a claimant's limitations in concentration, persistence, and pace when the questions otherwise implicitly account for these limitations. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 288 (6th Cir. 2009) (concluding that the ALJ's reference to a moderate limitation in maintaining "attention and concentration" sufficiently represented the claimant's limitations in concentration, persistence, and pace); *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (concluding that the hypothetical question adequately incorporated the claimant's limitations in concentration, persistence, and pace when the ALJ instructed the vocational expert to credit fully medical testimony related to those limitations).

*Winschel*, 631 F.3d at 1180–81 (footnote omitted). Thus, the general rule is that "an

ALJ does not account for a claimant's limitations in concentration, persistence, and

pace by restricting the hypothetical posed to the vocational expert to simple,

48

routine tasks or unskilled work." *Rosario*, 490 F. App'x at 195. However, there is an exception to the general rule "if the 'medical evidence demonstrates that [the] claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace' then 'limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations.'" *Id.* at 195 (quoting *Winschel*, 631 F. 3d at 1180) (alteration in original).

Here, the ALJ's question to the VE as adopted by the AC did not explicitly refer to Plaintiff's limitations in concentration, persistence, and pace. (Doc. 14-1 at 13; Doc. 14-10 at 72). Therefore, the Court looks to the exception and asks whether there is substantial evidence relied upon by the ALJ that shows that Plaintiff can do simple, routine, repetitive tasks despite those limitations. *See Beira*, 2013 WL 937736, at *9. The evidence that the AC relied upon to support its mental RFC (and by extension to support the appropriateness of the ALJ's question to the VE with respect to the moderate limitation in the ability to concentrate, persist, or maintain pace)[8] comes from Dr. Harpe's oral and written testimony. (Doc. 14-1 at 13–14).

---

[8] The ALJ's written decision did not find that the Plaintiff had the same RFC as adopted by the AC and did not include the limitation to simple, routine, repetitive tasks. (Doc. 14-1 at 29–30). Thus, the ALJ did not offer any analysis to support that limitation. It is the AC's analysis that is the relevant one in determining whether the question to the VE, posed by the ALJ, is proper.

As such, because the AC's discussion of Dr. Harpe's oral and written testimony is deficient, as noted above, relying upon that testimony to support the RFC is similarly deficient. Simply put, because the AC erred in evaluating Dr. Harpe's opinions on this issue, the Court cannot determine whether the AC relied on substantial evidence that shows that Plaintiff can do simple, routine, repetitive tasks. The Court cannot, therefore, find that the exception to the general rule applies, meaning that the AC erred by adopting the ALJ's hypothetical question to the VE and not explicitly or implicitly accounting for Plaintiff's limitations in concentration, persistence, and pace. After the AC properly accounts for Dr. Harpe's opinions on remand, it should then determine whether it can rely upon the ALJ's hypothetical question to the VE.

### 2.   *The Apparent Conflicts Between the VE's Testimony and the DOT*

Plaintiff argues that the AC failed to reconcile apparent conflicts between the testimony of the VE and the description of jobs found in the DOT. (Doc. 18 at 37–38). Plaintiff contends that there is an apparent conflict between the AC's RFC finding that limited Plaintiff to "simple, routine, repetitive tasks" and the jobs that the VE identified—including a sub-assembler of electronic parts, an assembler of small parts of molded frames, and a marker II—all of which involve carrying out

detailed written and oral instructions (the jobs involve a "reasoning level 2" in Social Security parlance). *Id.* at 39. In response, the Commissioner argues that a limitation to simple, routine, and repetitive tasks does not apparently conflict with a reasoning level 2. (Doc. 24 at 34–42).

SSR 00-4p explains that before relying on VE testimony, an ALJ must: "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs…and information in the [DOT]…and [e]xplain in the determination or decision how any conflict that has been identified was resolved." SSR 00-4p, 2000 WL 1898704, at *1 (S.S.A. Dec. 4, 2000). Under this policy interpretation, "the ALJ has an affirmative obligation to identify any 'apparent' conflict and to resolve it." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1362 (11th Cir. 2018) (holding that an ALJ may not simply take the VE at his word that his testimony comports with the DOT when the record reveals an apparent conflict between the testimony and the DOT). A conflict between the testimony of a VE and the DOT is "apparent" if it "seem[s] real or true, but not necessarily so" to "an ALJ who has ready access to and a close familiarity with the DOT." *Id.* at 1366 (internal quotation marks omitted). "Put another way, if a conflict is reasonably ascertainable or evident, the ALJ is required to identify it, ask about it, and resolve it in his opinion." *Id.*

51

The subassembler job has a reasoning level 2, which requires an ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." Dictionary of Occupational Titles (DICOT) § 729.684-054, 1991 WL 679729 (G.P.O. Fourth Edition, Revised 1991). The jobs of assembler of molded frames and marker II also have a reasoning level 2. DICOT § 713.684-014, 1991 WL 679261 (G.P.O. Fourth Edition, Revised 1991); DICOT § 920.687-126, 1991 WL 687992 (G.P.O. Fourth Edition, Revised 1991).

Resolution of this issue turns on whether there is an apparent conflict between a claimant's ability to perform jobs at a reasoning level 2 and an RFC that limits the claimant to simple, routine, repetitive tasks. The caselaw interpreting *Washington*—which definitively established the ALJ's affirmative obligation to identify any apparent conflict—is unsettled. On the one hand, some cases hold that pre-*Washington* authority holding that there is no conflict between a reasoning level of 2 and a limitation to simple work, remains good law. *See, e.g., Buckwalter v. Saul*, No. 18-14506-CIV-MAYNARD, 2019 WL 4277487, at *11 (S.D. Fla. Sept. 10, 2019), *appeal filed*, No. 19-14420 (11th Cir. Nov. 7, 2019); *see also Barcus v. Saul*, No. 19-14290-CIV-MAYNARD, 2020 WL 3839701, at *6 n.2 (S.D. Fla. July 8, 2020) (citing *Buckwalter*, 2019 WL 4277487, at *12). On the other hand, "[m]ost district

courts in this Circuit post-*Washington* have…found an apparent conflict when an ALJ's hypothetical question posed to the VE limits a claimant to simple work and the VE then identifies representative jobs for the claimant that have reasoning levels of two or three." *Nadile v. Saul*, No. 8:19-cv-9-T-CPT, 2020 WL 1430701, at *4 (M.D. Fla. Mar. 24, 2020) (remanding to the ALJ to resolve an apparent conflict between a limitation to simple, routine, repetitive job tasks and jobs (including that of a small parts assembler) that require a reasoning level two); *see also Breiding v. Comm'r of Soc. Sec.*, No. 6:19-CV-689-Orl-MAP, 2020 WL 1910353, at *4–5 (M.D. Fla. Apr. 20, 2020) (remanding to the ALJ to resolve an apparent conflict between a limitation to simple tasks and a job that requires reasoning level two); *Daniel v. Comm'r of Soc. Sec.*, No. 5:19-CV-83-OC-MAP, 2020 WL 1485900, at *3 (M.D. Fla. Mar. 27, 2020) (remanding to the ALJ to resolve an apparent conflict between a limitation to simple, repetitive tasks and a job with a reasoning level two); *Howard v. Comm'r of Soc. Sec.*, No. 8:18-cv-2004-T-PDB, 2019 WL 4738137, at *1–2 (M.D. Fla. Sept. 27, 2019) (remanding to the ALJ to resolve an apparent conflict between a limitation to understand, remember, and carry out only simple instructions and a job with a level two reasoning requirement); *Salermo v. Saul*, No. 8:18-cv-979-TGW, 2019 WL 4595157, at *3 (M.D. Fla. Sept. 19, 2019) (remanding to the ALJ to resolve an apparent conflict between a limitation to simple, routine, repetitive tasks and

53

jobs that require reasoning level two and suggesting that the Commissioner could appeal one of the many decisions identifying such apparent conflict to obtain clarification on this issue from the Eleventh Circuit); *Borroto v. Comm'r of Soc. Sec.*, No. 2:17-cv-673-FtM-99CM, 2019 WL 488327, at *9–10 (M.D. Fla. Jan. 8, 2019) (recommending remand for the ALJ to consider the apparent conflict between a limitation to simple, routine tasks and jobs with reasoning levels two and three), *adopted by* 2019 WL 290599 (M.D. Fla. Jan. 23, 2019).

Here, the Court holds that there is an apparent conflict between the limitation to simple, routine, repetitive tasks and the jobs requiring a reasoning level 2. *Washington* changed the analysis such that the requirements of SSR 00-4p "focus[] less on the outcome of the ALJ's investigation into the conflict—*i.e.*, whether or not the ALJ concludes there is an actual conflict between the VE's testimony and the DOT—than on ensuring that the ALJ investigates whenever the potential for a conflict clears this 'apparent' threshold." *Johnson v. Comm'r of Soc. Sec.*, 782 F. App'x 875, 878 (11th Cir. 2019). The question to ask is whether a conflict is "seeming[ly] real or true, but not necessarily so," to "an ALJ who has ready access to and a close familiarity with the DOT." *Washington*, 906 F.3d at 1366 (internal quotation marks omitted). The Commissioner cites to dictionary definitions and parses out fine points in the similar meanings of the relevant

54

vocabulary such as "simple," "routine," "standardized forms," and "few concrete variables." (Doc. 24 at 34–36). If the relevant inquiry required deciding whether the conflict was apparent to an ordinary person or to Noah Webster, then the Commissioner's argument would be more persuasive. However, the undersigned finds it significant that the holding in *Washington* was based partly on "the robust nature of the ALJ's investigatory responsibilities" and discussed a conflict being apparent "if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out not to be the case." 906 F.3d at 1365.

The Commissioner also cites to *Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005 (11th Cir. 2020). (Doc. 29). In that case, the hypothetical to the VE imposed a limitation to simple, routine, and repetitive tasks. *Valdez*, 808 F. App'x at 1007. The VE identified three jobs, one at reasoning level three, one at reasoning level two, and one at reasoning level one. *Id.* at 1009. The plaintiff appealed only as to the job requiring a reasoning level three. *Id.* at 1008–09. The Eleventh Circuit decided that it did not have to resolve the "level three" question because, even if there was error, the plaintiff did not appeal as to the other jobs, which had reasoning levels one and two. *Id.* at 1009. The court wrote: "Valdez has not argued that these jobs [the ones with reasoning levels one and two] are inconsistent with his residual

functional capacity, and they are not." *Id.* The Court is hesitant to put much weight behind this one sentence from an unpublished, non-binding circuit opinion. Indeed, the panel may have simply been holding that the level one and level two jobs were consistent with the plaintiff's RFC because the plaintiff did not raise that issue as error on appeal. Either way, without more in the way of explanation, the Court does not find *Valdez* persuasive here.

Defendant also cites *Hurtado v. Comm'r of Soc. Sec.*, 425 F. App'x 793 (11th Cir. 2011). In that pre-*Washington* case, the Eleventh Circuit found no apparent conflict between a limitation to "simple routine tasks with limited contact with the public" and jobs requiring reasoning levels two and three. *Id.* at 795. The *Hurtado* panel relied heavily on *Jones v. Apfel*, 190 F.3d 1224, 1230 (11th Cir. 1999), where the court held that "when the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT." 190 F.3d at 1229–30. *Jones*, however, preceded SSR 00-4p, which the Eleventh Circuit analyzed in *Washington*, and which the court made clear now controls the analysis. *Washington*, 906 F.3d at 1360–61. The Court is not persuaded by *Hurtado*, which relied on *Jones*, which does not mention SSR 00-4p, and which, obviously, came well before *Washington*.

There is also the issue of *Chambers v. Comm'r of Soc. Sec.*, 662 F. App'x 869 (11th Cir. 2016). In *Chambers*, the court rejected an argument that jobs with

56

reasoning levels of two and three were inconsistent with "simple work." *Id.* at 873. The court alternatively held that there was no apparent inconsistency because the plaintiff did not raise the issue with the VE at the hearing, and the VE affirmed that his testimony was consistent with the DOT. *Id.* It is unlikely that the second, alternative holding survives *Washington*. But district courts have struggled with how much weight to afford the other holding from *Chambers*, that "jobs labeled with reasoning levels of two or three…may also be jobs with simple tasks," 662 F. App'x at 873, following *Washington. Compare Vanwinkle v. Saul*, No. CV 118-143, 2019 WL 3562129, at *7 (S.D. Ga. July 8, 2019) (relying on *Chambers* for the proposition that a limitation to simple, routine work does not preclude performance of jobs as high as reasoning level three), *adopted by* 2019 WL 3554651 (S.D. Ga. Aug. 5, 2019), with *Borroto*, 2019 WL 488327, at *10 (noting that in "prior cases finding no apparent conflict between a reasoning level of up to 3 and a limitation to simple tasks, the courts either evaluated post hoc the particular requirements of the identified jobs—now impermissible under *Washington*—or relied on now-defunct legal propositions" and citing *Chambers* and *Hurtado* as examples).

This much is clear. The Court is bound by *Washington*, which analyzes SSR 00-4p and which significantly changed the landscape in this area. *Chambers*, which

is unpublished and therefore not binding, precedes *Washington* and does not mention SSR 00-4p. Of all the non-binding authority noted above, including other decisions from district courts and unpublished Eleventh Circuit opinions, the Court finds most persuasive (for the reasons noted above) those courts that have interpreted SSR 00-4p and *Washington* to find that an ALJ must at least address an apparent conflict between a limitation to simple, routine, and repetitive tasks and jobs that involve a reasoning level two—which, again, require an ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." DICOT § 729.684-054, 1991 WL 679729.[9]

This is, as demonstrated by the wealth of conflicting authority noted above, a close case; "simple" (from the RFC) and "uninvolved" (from the DOT) are similar concepts. But "simple, routine, repetitive tasks," (Doc. 14-1 at 13), are different enough from "detailed but uninvolved…instructions" and "problems involving a

---

[9] The Court likewise declines to spend much time on the pre-*Washington* district court cases Defendant cites, (Doc. 24 at 38–39), or the out-of-circuit authority, *id.* at 37–38. Indeed, there is plenty of non-binding caselaw from within the Eleventh Circuit to sufficiently muddle the issue without reaching to that of other circuits— particularly where there is a recent, published opinion from the Eleventh Circuit that extensively lays the parameters for the analysis.

few concrete variables" that the investigatory responsibilities of the ALJ should kick in to analyze this apparent conflict in the first instance. *Cf. Washington*, 906 F.3d at 1365; *Bowen v. City of New York*, 476 U.S. 467, 480 (1986) ("Congress designed [the Social Security Act] to be unusually protective of claimants." (internal quotation marks omitted)). On remand, the Commissioner should resolve this apparent conflict.

### D.   Reversal for an Award of Benefits

Plaintiff asks that the case not be remanded but, instead, that the Court reverse and award benefits. (Doc. 18 at 40). The Eleventh Circuit has explained that a court may remand for entry of an award of benefits "where the Secretary has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Here there are numerous issues that the Commissioner should address in the first instance, including the weight to be afforded Dr. Harpe's opinions, the weight to be afforded Plaintiff's testimony, and the apparent conflict between the RFC and the jobs identified by the VE. The Court cannot say that the cumulative effect of the evidence establishes disability without any doubt. The Court recognizes that Plaintiff's claim has spent many years before the Commissioner, and the Court is confident the AC will address the matter

expeditiously on remand—the evidence relating to the time period at issue is only getting older.

## VI.   CONCLUSION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's final decision be **REVERSED AND REMANDED**.

This is a Final Report and Recommendation, there is nothing further pending in this action, and the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 18th day of August, 2020.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

60